Gerald N. Sims, counsel for the appellate, the leader of the Los Angeles team, and the San Diego Testing Services team Paul John Leeds, counsel for the appellate, Christopher John Hamilton, and Elizabeth Leigh Tisman. Good morning. May I please court Gerald Sims of Powell, Sims, Duncan, and Stevenson on behalf of Elite and San Diego Testing Services, the appellants in this matter. Your Honor, I'd like to reserve five minutes. Thank you, counsel. Please proceed. Thank you. Well, this is the second trip, recent trip to this court for this case. About a month ago in a panel on which Judge Lafferty sat, this court affirmed the non-dischargeability judgment that was granted in favor of appellants and also reversed the bankruptcy court's order on post-judgment interest. And the panel ruled that appellants were entitled to 10% interest on their non-dischargeable judgment. And so now we're here with respect to the plan, and we believe that the plan, which was confirmed, the Sixth Amendment plan, should be reversed and sent back. Is somebody prepared to tell us what the difference is in light of the recalculated interest? Yes, Your Honor. I can jump right to that. Yeah, would you? Because I'm kind of curious. As confirmed, I think the plan envisioned about a 6.5% dividend to the unsecureds. Your Honor, the plan did assume a 6.5% dividend. Yeah. And I don't think that changes. Okay. And I'll tell you what. Okay. The allowed claim for purposes of the plan on the unsecured side, we have a secured claim I'm not going to deal with today. Right. On the unsecured side, the claim amount is $1,906,501. And that represents 83% of the total unsecured claims. Now, what the decision on the interest does to our claim is significant. The principal amount of that 1.9 number I just gave you is about $1.79 million. So the 10% interest on that is about $14,817 a month. Okay. From the petition date in April of 2014 through the confirmation date in September of 2017, the interest that would have accrued is about $596,000. That gets us to confirmation. During the five-year term of the plan, another $895,000 of interest will accrue. And so when you add all that up and then deduct what is essentially the 83% of the $150,000 that goes to unsecured creditors, what happens at the end of the plan is that the appellants would have a claim of about $3.27 million. So starting with a claim on a petition date of $1.9 million, going through the whole plan, at the end of the day, eight and a half years after the petition was filed, appellants' claim would be $3.27 million. But your position is the rest of the unsecureds get the same 6.5% dividend? The other unsecureds would receive $25,500. They would get 17% of the $150,000 that is to be paid. Okay. So they're unaffected by this, basically? They would be unaffected by it. Okay, thanks. Helpful. So that really goes right to the point of the lack of feasibility of this plan. 1129A11 says that there has to be demonstrable proof that there's not going to be a required further liquidation or a further need for reorganization. And here, that further reorganization or liquidation is certain. All this plan is about is delay. The only source of payment under this plan is the salary that Mr. Hamilton would receive from Hamilton Consulting Corporation, HCC, or company HCC. That's it. And the debtor purports to devote all of their disposable income to payment under the plan. So there's no ability to build wealth. There's no ability under what we're hearing from the debtor side, appellee side, to grow any sort of asset and be in any position whatsoever to provide any payment to appellants other than the $124,500, which is about 8% of the interest accruals from the petition date through the projected end of the plan. About 14% of the interest accruals during the plan period. So as the panel observed in the prior appeal, these aren't the honest but unfortunate debtors that the Bankruptcy Code was designed to protect. The BAP citing to the Bankruptcy Court's ruling stated that the Bankruptcy Court found that Mr. Hamilton secretly plotted with forethought aplenty to destroy or cripple the elite entities. Public policy does not support Mr. Plan and Mr. Hamilton's case. And what was true in that decision is abundantly true here. This is about delay. After getting a $2 million judgment and having that judgment determined to be non-dischargeable or a paltry sum, the debtor is buying, with this plan, eight and a half years of not having to face up to their responsibilities. So that's simply – that's not in good faith, and I'll get to that a little bit more. Let me ask you a question that it may not be fair to ask you to muse about this, but we're talking about policy here. We're talking about forests and trees, I think, to some extent. What – can you – if the debtor can't confirm this plan, where it's going to pay something to the unsecured, it's admittedly not a great amount, but it's going to pay something, and I know you have objections about the liquidation analysis, and we'll talk about that in a minute, but at least the suggestion was they get zero. You know, the debtor could get a discharge of those relatively small number of claims in light of this case through seven, but those creditors wouldn't get anything. Is there a scenario you can see where absolutely the kind of structure we have here, the unsecured is going to get anything in an 11? Well, that's under this plan. I mean, could I postulate a plan where creditors get something? Sure. I guess – okay, I guess the question I'm asking is if we're going to take a policy position that this is problematic for all the reasons you suggest and it shouldn't be confirmed, is there a way? I mean, is it possible for unsecureds to get paid through an 11 in this kind of scenario? And if it isn't, I think we just have to confront that. Well, Your Honor, I think it's possible, but there has to – what's happened with the nondischargeable judgment is it totally changes the dynamic. Oh, I get that. That's why I'm asking the question. Right. So when we look at the cases that allowed the collection injunction, Mercado, Brotby, Brotby didn't allow it. It said that you could do it. It didn't allow it in that case because there was no balancing. Just this year there was no balancing. But in those cases, the plans – the starting point for both of those plans was 100 percent payment to the nondischargeable claim. It's kind of like a marshaling argument, right? If you just hold off a while, I'll get everything done, and then they'll all be happy. Well, and creditors in those cases were not promised 100 cents of the dollar. The nondischargeable creditor was, but had to wait within a period of time. But there were significant payments. There was 25 percent, I believe, in Mercado, 40 percent dividend to the creditors in Brotby. That's what had been proposed. And so in that scenario, the creditor that has the nondischargeable claim has leverage that other creditors don't. That's the reality. That changes the dynamic. Rather than cram down a plan that is, you know, de minimis payments on all creditors, you know, it was incumbent upon a debtor to go to that nondischargeable claim holder and try to negotiate a deal, come up with some way to do it. There was no – that's not what happened here. So you see plan after plan after plan after plan in this case. Denied confirmation. And they didn't really change a lot in terms of – it grew a little bit, grew a little bit, and you end up with a 6.5 percent distribution to creditors. But I think when we look at this in the totality of the circumstances, and that's why I think so much of the Dollar Associates case, which has always impressed me as needing to look at the whole case, to look at, you know, what's fair and equitable. And it's not a matter of just checking the boxes, going down 1129A. You have to look at what the real effects are. And here the real effect is that the debtors stole a business. And there are financial consequences to appellants. They went to court. They got a judgment. And a jury quantified those. Does that mean that it can't reorganize? It may be that they can't reorganize. One of the issues – let me jump to the whole issue with HCC. HCC is supposedly a company formed by the debtor's mother. We never really got to deal with whether or not HCC was the alter ego. The court made various statements that we reflect in our brief about how this is suspicious. It kind of smells funny. Ultimately, the bankruptcy judge said, we really don't have to go there. We're going to have to decide if this company should be part of the bankruptcy estate because the only sorts of funds is what Mr. Hamilton's salary is going to be, and that's going to be the same whether it's part of this estate or not. I think that misses the boat because I think there's an economic entity that was created there that actually might have driven a confirmable plan of reorganization, but the debtors didn't want that in their estate, and they took efforts to take it away from the estate and keep it totally separate. You've got about four minutes left. Okay. Total? Then I will reserve the rest of my time. Thank you. Thank you. May it please the Court, Paul Leeds. Exploiture in Mack for the debtors Christopher Hamilton and Elizabeth Tesselin. Ms. Tesselin is present in court today. Gentlemen, I have to take immediate exception to two statements from my counsel, and while to put some context into this because we are going to be talking a little bit about policy, but it's always a concern to me when inflammatory statements are made, which are simply not supported by the record. One especially is that there was no effort to negotiate a deal with Elite. None of that, frankly, is in the record, but I can assure the Court that there were many attempts at mediation, two or three formal mediations, all of which failed, and not because of my client's conduct necessarily, not because, well, they were difficult negotiations. The Court probably has the flavor of this type of dispute, so I won't dwell on that. The point is that the efforts were made. These people came into bankruptcy because they had a judgment they could not pay. That's never been disputed. In fact, it's affirmatively conceded by Elite in their papers to the Court's question to the point that what is going to happen if they can't reorganize? These people came in in good faith because they had a choice. Appeal the judgment or deal with it in bankruptcy and pay what they're required to pay under the bankruptcy laws. Are they getting a bond-free stay through the bankruptcy? Is that the gist of it? Well, hardly bond-free, Your Honor. They did not have money to post an appeal bond. That is true. In the meantime, a million bucks has been spent and paid on account of these issues, right? It has been incurred, Your Honor. Okay, that's troubling. But not because of the debtor's conduct. We proposed a plan in October of 2014 that was the form plan for the settlement. You're on your sixth amended plan. That speaks loudly, Counsel. I'm sorry, Your Honor? You're on your sixth amended plan. That speaks very loudly, Counsel. I disagree, Your Honor. The plan, frankly, did not change fundamentally through the course of six amended plans. What happened is we had very two hostile litigants, and this is reflected in the record. You had SUMA, which was the entity that was formed, fighting against Hamilton to prevent him from competing. The only way Mr. Hamilton is going to make the money to repay these appeals. One might conclude they came by that honestly. I'm sorry, Your Honor? One might conclude they came by those feelings quite honestly. Okay? Let's move on to something else. Let's move on to something else. Let's talk about the injunction. Okay? Mr. Hamilton set up a business, and he needed to be able to operate that business to repay his creditors. Wherever we were in October of 2013 and early 2014, he had to make money to repay this debt. He chose, with the advice of counsel, to go in and say, well, we'll go into bankruptcy. You're going to have to contribute all your disposable earnings for the next five years. Any property you have that isn't exempt is going to go to pay creditors, and there will be a determination about non-dischargeability. And at the end of the day, you will have to pay whatever is deemed to be non-dischargeable. You can fight the non-dischargeability characterization, and he did that. And so you have a plan in front of you that contributes all of his disposable earnings under 1325 as required by 1129A15. That's all in there. It has a – that produces about a $90,000 payment to creditors. There was a $60,000 payment from SUMA to the estate, which gives you an idea of where that litigation went, Your Honor. And that payment was put into the estate as the first payment under the plan. He negotiated with his employer. And, yes, it was a family company because, frankly, at that point he was having a difficult time finding a trade partner that he could work with. He had had two very hostile encounters, and now it went to a family-owned business. There's no doubt about it. That company was set up under the watchful eyes of the bankruptcy court, and everything was fully disclosed during this Chapter 11 process about what happened, what revenue would come in, and how it was going to support the plan. All that was done in a good faith to attempt to repay large amounts of money that he knew he was going to have to repay, whether it was the $500,000-ish amount that we thought would be non-dischargeable at the beginning. We knew there was going to be a part. We stipulated to part of the judgment being non-dischargeable because there was an intent element found by the jury. Hamilton didn't try to challenge that. Went in and stipulated that part of it was going to be non-dischargeable, but still put this plan together, sought funding to pay the admin so that he could get through this process, reject the SUMA operating agreement that was keeping him from competing and making the money he would need to make, because otherwise he's out of business.  Paid huge attorney's fees, fighting with Elite and with SUMA about these five different objections to the plans, frankly, none of which asked for anything other than we want more information, more information, more information. Most importantly, through that process, Judge Latham thoroughly vetted every single issue that Elite now complains about on confirmation because the standard here isn't what we're going to do with this case. The standard is, did Judge Latham make any mistakes? Did he do anything implausible, illogical, or not supported by the factual record? Yes and no, in the following sense. What is the overall bankruptcy purpose and objective of this plan? It's to repay creditors, get a discharge. And how much are you paying to the unsecureds generally? $150,000. What's that percentage? It's about 6.5%? If you count the Elite claim, but as to the other creditors, all of whom voted for the plan. Everybody but Elite voted for the plan. Of course they did. Because it was in their interest to do so. Because they otherwise have the gorilla to deal with, and the gorilla has a nondischargeable claim. Of course they did. The creditors didn't have that gorilla, Your Honor. The other creditors wanted to... Look, if you give, if you allow the nondischargeable claim to exercise its rights here, I mean, I think this cuts in your favor to some extent. Nobody else gets anything, right? That's the bottom line. So let's talk now about the injunction. Yes, Your Honor. Okay, so let's talk about the injunction, and what's the purpose of the injunction? The injunction is to allow Hamilton to earn a living for five years, repay what he can, get his injunction at the end of the five years, and then deal with Elite at the end of this thing. He has paid Elite $300,000 on a secured claim. They have a secured claim in the House. They're getting paid a substantial amount on that, and they're getting paid a dividend during the plan process. At the end of that process... Are they, in fact, going to be owed quite a bit more at the end of the process than they... Those can get $2 million or $3 million if that doesn't hold, Your Honor. But we have appealed to the Ninth Circuit. It's not a fait accompli, and I don't mean to... I understand this panel has made its decision about it. As this panel may be aware, there's Ninth Circuit authority that has to be dealt with, and I don't think the panel below had, frankly, a lot of choice about it. And we were very clear about that from the beginning. We're looking for a distinction between Hawkins and the Jurisdiction line of cases. I remain hopeful and confident that we'll convince the panel to go with the Hawkins line. My point is it's not a fait accompli, and to your point, in terms of talking to counsel, it doesn't affect the plan in terms of feasibility. And I don't mean to go off the injunction issue, Your Honor, but I will submit that Judge Latham did an extensive analysis of the injunction, made factual findings. They're all supported in the record, and I did cite to that in our brief. So there's nothing implausible about Judge Latham's finding. Here's my problem, and I don't know if my colleagues share it exactly or not. You know, on the one hand, 1129A1X sets forth a checklist. On the other hand, everybody agrees we're looking at a totality of the circumstances kind of analysis here when we're talking about good faith and talking about what we're doing. You know, the Bankruptcy Code is enormously disruptive to people's rights. We begin every analysis, what are people's state law rights, how does the Bankruptcy Code change that, and what's the reason for changing that, right? So, I mean, we're presented with a plan that creates some entity out here that Judge Latham stopped worrying about at some point, and we'll come back to that in a second, just bear with me, okay, that creates an injunction that is nowhere to be found in the Code, although some cases have said the fact that it's not prohibited means you can do it, has the effect of paying 6.5 percent to a bunch of unsecured creditors who have no other options, holds off the holder of an enormous non-dischargeable claim, doesn't pay them very much, and allows other things to happen in the penumbra of this that in the real world might give you a shot in five years of making a different kind of payment, but that's entirely at the debtor's option. So, I mean, I look at this plan and I ask myself what bankruptcy purpose is being served here, and when you look at all those factors. Well, there is quite a bit of money. The volume is skewed. Percentages are skewed because of the size of the elite claim. I understand that. You call it 6 percent. Most people won't make this amount of money in a lifetime. Hamilton at least has a shot at paying a significant amount, not only of his existing creditors but to elite. There were priority tax claims that were paid in full. His opportunity to earn a discharge of all the dischargeable claims is an important policy. He could do that in the 7, but he just couldn't get the injunction in the 7, right? Couldn't reject the operating agreement from SUMA in the 7, Your Honor. That was the problem. Yeah, but the bottom line is he could get a discharge in the 7, but he couldn't get the injunction in the 7. Correct? No, that's true. That's true, Your Honor. But more importantly, and I will submit the record supports that what this was driven by was rejection of the SUMA operating agreement. That is replete in the record in the plan that the purpose of this was that if the SUMA operating agreement was enforced, Hamilton was out of business and he could not do the one business that has a hope of getting elite paid. See, I'm going to agree with you on that. I mean, the striking thing about this from elite's perspective is they can't both drive your client out of business and get paid. It's one or the other. And I, you know, I look at this and I wonder why, and I'm not going to ask anybody to tell me something that they said in confidence. It's striking to me that a deal wasn't cut here. I mean, I can see all kinds of ways it could happen. I'll just say that and leave it, okay? Hope springs eternal, Your Honor. I'll just say that and leave it. The Ninth Circuit has a mediator. Okay, forget I said that. Those discussions, I understand, Your Honor. My point is it was very much driven by the attempt to create a business that could repay whatever the obligation was going to be, whatever the dischargeable obligation was going to be, and that's replete. Now, in the record, Judge Latham lived with this case for three torturous years. We went through five iterations of the plan, but only because of additional information requests primarily. As that was going on, there was very expensive litigation going on with both SUMA and elite. And, yes, they had to keep up with that. On day one, if someone said there could be a million dollars in litigation fees coming into this Chapter 11, no one in their right mind would say, yeah, let's do that, instead of saying, no, let's put that money into settlement. But it's three-and-a-half years later that that realization comes around. And, frankly, to Hamilton's credit, they're still funding the very plan and probably slightly improved on the percentages that they could have done at the very beginning. So the good faith issue, I would proffer, is completely resolved. One, the court made a finding. Two, it's supported by the record and the plan in that it does everything the code requires it to do. It found an outside source to pay admins, found a way to pay those so we could still make the distribution required to creditors. The code at a minimum under 11A.15, it's that dividend. It's the disposable earnings that are supposed to go into the plan. Hamilton had little or no non-exempt property going into this. And he did all that. They both did that, frankly. And at the end of the day, elites' rights are unaffected. They want to go after that judgment, they can go after that judgment. It's not a fait accompli. It's a non-sec order to say, of course there's a need for reorganization or liquidation at the end of this. California enforcement of judgment law provides a way for an elite to collect on its judgment post-petition or post-completion of the plan. They can go after 25% of his earnings. They can go after property that, frankly, can't vest free and clear of a non-dischargeable claim. There is a process for that. It's going to play out. It doesn't mean he has to go in and reorganize. I think that's probably the only interesting question raised by this appeal because, frankly, Judge Latham did a remarkable job of not only analyzing every issue, the injunction, the new value contribution. The record is replete with factual findings and evidence supporting what the judge did. What elite is asking you to do, though, is to say, if there's a big enough non-dischargeable judgment at the end of this, you need to alter the priority scheme of Chapter 11. And here's why. You can't confirm, they're saying, if there is a significant non-dischargeable judgment at the end of this. What that means is the debtor is now required to pay that non-dischargeable judgment within the plan. The code says, no, within the plan, you have to pay administrative claims. You have to pay taxes. You have to pay the things with administrative priority. The code provides that if you've got a non-dischargeable judgment and if the judge exercises their discretion to put an injunction and it's a good faith plan, you're paying down that non-dischargeable judgment at least to some degree and you've got the opportunity to pay other creditors. How should we judge the bona fides of that injunction? Well, I don't know why you wouldn't. There's two decisions on it, Your Honor. The fifth plan and I think more on the sixth plan and the findings, the injunction is there because Hamilton can't do this plan without it. But that's not my question. The cases that have considered this have said, okay, look, maybe Chapter 11 is a relatively flexible concept and nothing in Chapter 11 says you can't get an injunction, we'll find one here. So what should the judge have been looking at to determine that an injunction was appropriate? Because the cases that are cited, as counsel pointed out, they're very different economics. So why is this appropriate? They do because I think the judge carefully looked at it as necessary for an effective reorganization, essentially that it was needed because for Hamilton to do it. You can always say that. Well, I'm not sure that they did in Brodby. I mean, both Brodby and Mercado, they didn't request the injunction. Brodby, she didn't make the findings. Judge Latham made the findings and he did it specifically in the record and I've cited it in the brief, the specific pages. But I think there were four or five pages devoted to here's the interest that Hamilton and their Hamilton's in the estate has in the reorganization and here's Elite's interest. It's going to get paid most of the money going to the estate for five years and its interests aren't harmed at the end because they're going to be preserved. Whatever the non-dischargeable judgment is at the end, they're going to get paid. So balancing those and Judge Latham balanced those and his findings are supported by this record most importantly. It's not illogical. It's not unsupported. What part of that is a question of law? I'm sorry, Your Honor. What part of that is a question of law? Well, application of the test, of course, is a question of law. I think so too. The test is laid out, I think, pretty well between Mercado and frankly Judge Ryan's analysis of Mercado is a good one and Brotby spent a lot of time going over and analyzing Mercado. But that's de novo for us, right? So I think it's a good decision and the discretion was exercised. I have 27 seconds if there are other questions or concerns. There's obviously a lot here and I understand that. I think what the court needs to understand is the Hamiltons very frankly had to face up to reality back in 2014. They chose to do so by going into the bankruptcy system to do what they could to pay creditors. And it has cost them dearly. They have put a lot of money and they've devoted the next four years of their lives to this plan. There's just no argument that's not good faith or that the bankruptcy purposes aren't achieved. Thank you, Counselor. Your time has expired. Thank you, Your Honor. You have three minutes and 49 seconds. Thank you. First, let me say that there's nothing in the plan that requires the elite to get paid its nondischargeable claim at the end of the plan. Where is that in the code? I'm just reacting to Counsel's statement, Your Honor. He indicated that elite would get paid at the end of the plan. I think it was could, but where is it? I mean, you make much of that fact through it, but where is that in the code? Well, I guess I would analogize it, Your Honor, to the nondischargeable tax claims where there is a prescribed treatment. We're not entitled to that, but it's the same concept here. It's the same policy that when there is a nondischargeable claim, you've got to pay it. It's got to get paid somehow. But that's not the requirement of the test under 1129. That is the balancing act that was done by Mercado and Brotby, Your Honor. Both of those cases. As to the injunction. With respect to the injunction. Right. So you have no problem with this plan if there's no injunction? I think, well, the plan is much less problematic if there's no injunction. I do think that the plan itself is in bad faith. I also wanted to address just briefly, if I might, the new value issue. The new value allegedly comes from HCC. It is the result of their payments on indemnity agreements that existed before the bankruptcy was filed. These indemnity agreements were assets of the debtor, should have been on the balance sheet of the debtor beforehand. It's not new value. During the bankruptcy case, prior to confirmation, I believe that the plan references some $760,000 of payments that were made by HCC under the indemnity agreements. There is no way that this is new value. This is nothing more than what you would see if there was a promissory note that it had been in default pre-petition. And with pressure brought to bear on that creditor, they decide to pay up in connection with the plan. That's not new value because that asset was on the books before the bankruptcy. And when we look at the new value cases, there has to be a change in the balance sheet. Where was the change? All that happened here was an asset that was a contractual right to be reimbursed became cash. It's still an asset. Nothing new happened. It would be like having a car that is worth $10,000 and selling it during the case and turning it into cash. There's no effect on the balance sheet. Just so I keep the housekeeping straight, if that was an agreement, was that a pre-petition agreement? Yes, Your Honor. Was it assumed? Was there an assumption? I can't answer that directly, Your Honor. Okay. These agreements are referenced throughout. Yeah. I wasn't sure it was pre-petition. That's why I'm asking. They were pre-petition. Now, the debtor, at page 27 of their brief, they said, oh, no, this happened in December of 2015. Yeah, that's what I remember. And that's simply belied by the fact that in April. Okay. We've got a record. That's okay. Okay. In April, they had said, this is how we're going to get paid. Okay. We have these indemnity agreements. Okay. So, Your Honor, the totality of the circumstances here, this is a bad faith case. It started out bad faith when they stole the business. It continued with a plan that stretches out an eight-and-a-half-year essentially free bond. The payments are de minimis, and I think we have to look at that and consider that. And if that means that the debtor can't get a plan, cannot satisfy 1129 and get a confirmed plan, that's what it means. Thank you, Counselor. Thank you very much. The order is submitted. Okay. We are adjourned.
judges: Kurtz, Lafferty, Spraker